(153 App. Div. 47.)

### WATERPROOFING CO. v. HYDROLITHIC CEMENT CO.

(Supreme Court, Appellate Division, First Department.   November 8, 1912.)

1. TRADE-MARKS AND TRADE-NAMES (§ 39*)—LICENSE—RIGHT ACQUIRED.

A licensee of the use of a certain system of cement coating, who took from the letter heads of the licensor a picture designed by it as a trade label and used exclusively in connection with licensor's products by the licensee and others while acting under the license, did not acquire any right to the picture for use as a trade label, though the scenic idea involved was suggested by a picture on a pamphlet issued by the successor of the licensee in advertising the cement.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 44; Dec. Dig. § 39.*]

2. COMPROMISE AND SETTLEMENT (§ 12*)—CONSTRUCTION—MATTERS COVERED.

An agreement between plaintiff and the trustee in bankruptcy of a company, under a license from which plaintiff had sold certain of the bankrupt's products, making a settlement with plaintiff in complete satisfaction of all demands of the company against the plaintiff "upon open account, or arising out of or under the contracts" granting the license, operated to cancel the contracts, with all obligations of the parties thereunder.

[Ed. Note.—For other cases, see Compromise and Settlement, Cent. Dig. §§ 54–74; Dec. Dig. § 12.*]

3. TRADE-MARKS AND TRADE-NAMES (§ 39*)—LICENSE—TERMINATION.

On the termination of the license given by the owner of certain patented cement products for the use thereof, the licensor could resume the use of the trade-names under which the patented product was sold.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 44; Dec. Dig. § 39.*]

4. TRADE-MARKS AND TRADE-NAMES (§ 93*)—PROTECTION BY INJUNCTION—EVIDENCE—ABANDONMENT.

In a suit to enjoin the use of a trade label by defendant after its alleged abandonment by defendant's predecessor, evidence *held* not to show that it was intended by defendant's predecessor to abandon the right to the trade-name.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 104–106; Dec. Dig. § 93.*]

5. TRADE-MARKS AND TRADE-NAMES (§ 97*)—INJUNCTION—EXTENT OF RELIEF.

In a suit to enjoin the use of a trade label by defendant after its alleged abandonment by defendant's predecessor, judgment should be rendered for defendant upon his counterclaim, to the extent of enjoining plaintiff from using the trade-name, upon a showing that plaintiff never acquired any right thereto as against defendant, irrespective of any rights therein of owners of the patents covering the product.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 110, 111; Dec. Dig. § 97.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. APPEAL AND ERROR (§ 1175*)—DISPOSITION—MODIFICATION OF JUDGMENT.
Code Civ. Proc. § 1317, as amended by Laws 1912, c. 380, provides
that, upon an appeal from a judgment or an order, the Appellate Divi-
sion may reverse or affirm, wholly or partly, or may modify the judg-
ment as to any of the parties, and it shall thereupon render judgment
of affirmance or reversal, and final judgment upon the right of any
parties, or judgment of modification thereon according to law, except
where a new trial is proper, when it may grant a new trial. *Held*,
that the Appellate Division may, in an equity case, modify the judgment
appealed from, so as to make the final judgment correct, without order-
ing a new trial, though it does not accept all of the findings, or make
additional findings or conclusions.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 4573–
4587; Dec. Dig. § 1175.*]

Appeal from Trial Term, New York County.

Suit by the Waterproofing Company against the Hydrolithic Cement
Company, in which defendant filed a counterclaim. From a judgment
dismissing the complaint and counterclaim, plaintiff appealed, and de-
fendant took a cross-appeal. Judgment dismissing complaint affirmed,
and judgment dismissing the counterclaim affirmed, as modified.

Argued before INGRAHAM, P. J., and McLAUGHLIN,
LAUGHLIN, CLARKE, and SCOTT, JJ.

D. Anthony Usina, of New York City, for plaintiff.

L. J. Frey, of New York City, for defendant.

LAUGHLIN, J. This is a suit in equity to enjoin the use of a
trade-mark or trade-name and trade label alleged to belong to the
plaintiff, and to enjoin unfair competition. The plaintiff and defend-
ant are domestic corporations. On the 1st day of January, 1906, plain-
tiff entered into an agreement in writing with the E. J. Winslow Com-
pany, an Illinois corporation, which had an established business in
Chicago and elsewhere, described in the contract as—

"consisting of waterproofing and damp-proofing of concrete or masonry walls,
foundations, basements, tunnels, etc., with especially prepared coatings known
as 'Hydrolithic Plasters or Stuccos' and as 'Hydrolithic Brush and Spray
and Weather-proof Coatings,' and of constructing waterproof cement floors
and bulkheads of a special design for which patents are pending."

The agreement recites that the plaintiff was "desirous of acquiring
rights, license, and authority to practice such business within the ter-
ritory" therein specified, and "to acquire and carry out contracts for
the performance of work by the methods and devices employed, or
which as improvements may be employed, by the party of the first
part," and the Winslow Company thereby authorized and licensed the
plaintiff "to solicit and perform in its own name hydrolithic coating
and construction work as has hereinbefore been set forth," in certain
states therein specified, for the period of five years from the date there-
of, in consideration of royalties therein agreed to be paid by the plain-
tiff. The plaintiff agreed to endeavor to create a demand for hydro-
lithic coatings and constructions, to make all contracts in its own name,
to notify the licensor of the making of contracts, and that it would not
become interested in any other system of waterproofing during the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

period specified, and would communicate to the licensor all information it received concerning rival systems, and assist in improving the system of the licensor, and that it would prominently stamp all of its work with the words "Winslow's Hydrolithic System," and that it would solicit all of its business as that of "Winslow's Hydrolithic Coatings and Constructions." The licensor agreed to furnish at cost the hydrolithic material required by the licensee, and sufficient advertising matter descriptive of its system; and it was expressly agreed that, in the event that the licensor should be unable to furnish the material as therein provided, the licensee should have the right to demand the formula for preparing materials, and it should be the duty of the licensor to deliver the same. It was further provided that the agreement might be renewed by the licensee by giving six months' notice, and that the licensee should have the right to cancel the contract on six months' notice, after the expiration of the first year. The agreement contained a provision obligating the licensee to defend any letters patent "included within the license," and in the event that the licensee should be sued for an alleged infringement of another patent, growing out of its use of "any process or apparatus or improvement therein" patented and included within the license, the licensor should at its own expense assume and conduct the defense, and save the licensee harmless. The contract further obligated the licensee, in the event of a suit for infringement, and on notice from the licensor, to discontinue the use of "the alleged infringing process or apparatus" until the suit should be ended, or the licensor consented to the resumption of such use; but the licensee was to continue to perform the contract, unless released therefrom by the licensor, or duly enjoined by a court. The final paragraph of the agreement was as follows:

"The party of the second part shall not, during the continuance of this license or thereafter, question, dispute, or attack in any way, manner, or form in defense of any suit or otherwise question the validity of said letters patent or the invention of the patentee thereunder."

This agreement was modified by another agreement in writing on the 11th day of February, 1907, by eliminating the provision authorizing the licensee to terminate the agreement on six months' notice, after the expiration of the first year, and by providing that the licensor should furnish at cost price "dry hydrolithic powder," and permit the licensee to use the same in the manufacture of hydrolithic coating with the privilege of purchasing the other materials elsewhere, and by further providing that the licensee should not have the right to advertise and represent itself as the manufacturer of hydrolithic coating, or hydrolithic cement, or that it has or operates a factory therefor, or that it has hydrolithic coating or cement for sale, and by prohibiting the licensee from selling or parting with hydrolithic powder, otherwise than as united and mixed with other materials in accordance with the formula to be furnished by the licensor, and by providing that the licensee should endeavor to prevent its agents, or others, from discovering a knowledge of the chemical composition of the hydrolithic powder, and that the licensee should use only the trade-mark of the licensor on the packages and sacks in the transportation of any hydrolithic products.

Neither contract contains any other reference to letters patent. Prior to the incorporation of the E. J. Winslow Company, E. J. Winslow had been engaged in the same line of business, and owned a secret process for making cement compounds, which, according to his testimony, he licensed the company to use, together with the trade-mark or trade-name "Hydrolithic," during the life of the company, or his connection with it; but it appears that letters patent were subsequently obtained by the company for a certain "process for making cement compounds," for an "apparatus for making cement compounds," and for "a certain process of constructing containing vessels." The evidence does not show whether or not any of these patents related to the secret process invented by Winslow; but Winslow's original process was for a liquid hydrolithic cement, and it is conceded that the patents which the Winslow Company obtained did not relate to *waterproofing*. Thereafter, and on the 2d day of March, 1909, Winslow obtained a patent in his own right on a process "for imparting superior waterproofing qualities to ordinary hydraulic cement," consisting of a hydrolithic powder, for which he applied on August 16, 1906.

The parties entered upon the performance of the agreement licensing the plaintiff, and of the agreement modifying the same, and continued to perform them in all respects, excepting as will be presently pointed out, until the 16th of April, 1908, when a petition in bankruptcy was filed against the Winslow Company, and a receiver in bankruptcy was appointed for it. It was thereafter, and on the 29th day of the same month, duly adjudged a bankrupt, and the receiver was appointed trustee. About three months prior to said 16th day of April, 1908, the plaintiff, in violation of its agreement, caused the hydrolithic powder, supplied to it by the licensor, to be chemically analyzed, whereby it became acquainted with the ingredients thereof. It attempts to justify this upon the ground that it had been notified that it was infringing another patent, and it claims to have been convinced of this on making the analysis. Upon the appointment of the receiver in bankruptcy, the licensor discontinued the manufacture and sale of waterproofing cement and coatings, and discontinued the use of the trade-name, trade-mark, and label which had theretofore been used by it and by the licensee. The evidence is uncontroverted that Winslow, prior to the organization of the Winslow Company, used the word "Hydrolithic" in connection with the cement which he manufactured, and the cement became known to the trade by that name.

The trial court also found that Winslow had, prior to that time, adopted as a trade label a picture of a desert scene, with three pyramids, surrounded by two concentric circles, in which appeared at the top the words, "Dry as the Desert," and at the bottom the words, "Permanent as the Pyramids," and outside the circles at the top appeared the words, "The Hydrolithic System," and at the bottom the words, "E. J. Winslow Co." There is a conflict in the evidence on this point. It is contended in behalf of the plaintiff that it invented and exclusively used this desert scene label. It is uncontroverted, however, that it was taken from a similar emblem on the letter heads of the licensor, and it was used exclusively in connection with its products, and by the

licensee while acting under the license, and there is, beyond this, evidence that it was designed as a trade-mark or trade label by the licensor; the idea having been suggested by the picture on a pamphlet issued by plaintiff in advertising this cement.

[1] In these circumstances, the plaintiff could acquire no right to this desert scene label, thus used in connection with the Winslow Company's goods. Upon the appointment of the receiver in bankruptcy, the plaintiff caused to be made for it, pursuant to the formula which it had obtained by said analysis, waterproofing material identical with the material formerly supplied to it by the Winslow Company, and has ever since carried on the business of supplying said material, and applying the same to structures to be waterproofed; and it has used the term "Hydrolithic" as its own trade-mark, and in stamping its goods has substituted its own name for the name of the Winslow Company, and has used the desert scene label as its own on tags attached to the packages and sacks. It has also solicited and transacted this business in its own name, and it has paid no royalties under the contract since the Winslow Company ceased furnishing material pursuant to the contract, and it has had the word "Hydrolithic" registered in the United States Patent Office at Washington as its own trade-mark in connection with said business.

[2] On or about the 1st day of December, 1908, the trustee in bankruptcy, pursuant to an order of the court, made a settlement with the plaintiff in full and complete satisfaction of all claims and demands of the bankrupt company against the plaintiff "upon open account or arising out of or under the contracts of January 1, 1906, and February 11, 1907." On the filing of the petition in bankruptcy, E. J. Winslow resumed the manufacture and sale of this cement, and used said trademark, trade-name, and label in connection therewith, and occupied the offices occupied by the bankrupt company until its failure. It appears by the testimony of the vice president of the plaintiff that the contracts were canceled, but no date is given. It was not shown that the plaintiff gave any notice of its election to cancel the contract on account of the licensor's inability to perform; but the contract must be deemed to have been canceled by said settlement agreement, if not before.

The plaintiff has brought this action upon the theory that it owns the trade-mark or trade-name and label. It has, however, produced no evidence of title, or even license. The only theory upon which it claims title is that they were abandoned by the trustee in bankruptcy, by his failure to continue to use them, or to sell them when he sold other personal property of the bankrupt company. It appears that on the 25th day of June, 1908, pursuant to an order of the federal court, the trustee sold to one Reithel all his right, title, and interest, as trustee, in and to the personal property of the bankrupt company, set forth, enumerated, and described in his inventory then on file, and in and to the patented process and apparatus for making cement compounds, to which reference has been made as having been issued to the bankrupt company, together with other letters patent, not material to the questions presented for decision.

[3] It is contended, in behalf of the plaintiff, that inasmuch as the trade-mark or trade-name and label and good will of the business were not sold with the other personal property, they were abandoned, and that the plaintiff was at liberty to appropriate them, as it did. That proposition is not tenable. If Winslow merely licensed the company to use "Hydrolithic" in connection with selling cement manufactured pursuant to his secret formula, then on the termination of the license he would have the right to resume the use of both formula and trade-mark or trade-name. Cutter v. Gudebrod, 44 App. Div. 606, 61 N. Y. Supp. 225, affirmed 168 N. Y. 512, 61 N. E. 887; Godillot v. American G. Co. (C. C.) 71 Fed. 873; Batcheller v. Thomson, 93 Fed. 661, 35 C. C. A. 532. If they were assigned to the company, then they were either sold by the trustee with the other property, or the right to use them passed with it as an incident to the sale, or title thereto remained in the trustee.

[4] There is no theory upon which it can be maintained that there was any intention on the part of the trustee to abandon the good will of the business, or the trade-mark and label, even if he could have done so as against the rights of creditors, which is a point upon which no opinion is expressed. Moreover, subsequent events show that such was not his intention. On the 13th day of April, 1909, an application was duly made to the court by the trustee for leave to sell the good will of the business and his right, title, and interest in and to said trade-mark or trade-name and label, and he was duly authorized to sell the same, and did sell said property to the defendant, a corporation organized under the laws of New York, on the 21st day of December, 1908, for the sum of $50. On the incorporation of the defendant, it succeeded Winslow in conducting the business he had been conducting since the failure of the Winslow Company, by the consent and license of Winslow, if not by formal assignment of his interest in the good will, trade-marks, and trade label, and his patent. It appears that the other personal property, which had been theretofore sold by the trustee in bankruptcy to Reithel, was transferred by him to three individuals, two of whom assigned their right, title, and interest to the third, one Pronger, who is not a party to this action, and in whom, so far as the record shows, the title is still vested. Reithel subsequently attempted to assign any right, title, and interest that he might have in the good will, and in the trade-mark and label, to the defendant; but we attach no importance to that instrument, for we think he had already parted with all the title he had acquired, which, as we construe the evidence, did not include the trade-mark or trade-name and label. The defendant has some evidence of title and of right to continue this business, using said trade-mark or trade-name and label, and its title and right are sufficient to prevail against the plaintiff.

We are of opinion, therefore, that the learned trial court was right in dismissing the complaint; but the counterclaim should not have been wholly dismissed. Since the purchaser of the other personal property, including the patents for the cement compounds, but not the patent subsequently acquired by Winslow individually for the hy-

drolithic powder, is not before the court, and Winslow individually is not a party, we refrain from expressing an opinion on the question as to whether their property rights have been invaded by the acts of the plaintiff in the premises, and we express no opinion with respect to the value, or ownership, of the good will, or whether the value of the trade-mark or trade-name and trade label is affected, or to what extent it is affected, by the fact that the ownership of the patents with respect to which they were used is outstanding in another. See Matter of Jaysee Corset Co., Bankrupt (U. S. Dist. Ct. S. Dist. of N. Y., Nov. 9, 1911) 201 Fed. ——, and Mayer Fertilizer & Junk Co. v. Va. Chemical Co., 156 O. G. 539.

It appears by the testimony of one witness that the trade-mark and label, distinct from the business, are exceedingly valuable. The trial court might have required that said Pronger and Winslow be brought in as parties to an accounting by the plaintiff under the defendant's counterclaim; but, since they were not brought in, I am of opinion that we should refrain from ordering an accounting, leaving the question with respect to damages, if it should be important, to be determined in another action, to which they may be parties; for it is evident that questions may arise with respect to whether the good will survived the transfer of the other property, particularly the patents, and with respect to its value, in view of such former sale, if it did pass to the defendant, and whether Winslow still has any interest.

[5] I think, however, that the court should have ordered judgment for the defendant on the counterclaim, to the extent of enjoining the plaintiff from using the trade device, or name, or mark, and desert scene label, and advertising itself as the successor to the Winslow Company, for, however the title, or rights, or interest of the defendant may be affected by the outstanding ownership of said patents, its title or right to use them is good as against the plaintiff.

[6] In view of the amendment to section 1317 of the Code of Civil Procedure, made by chapter 380 of the Laws of 1912, this being an equity action, we think that this court is now authorized to make the final judgment as it should be, without ordering a new trial, even though it does not accept all of the findings made by the trial court, and without formally making new or additional findings or conclusions of law. See Bonnette v. Molloy, 138 N. Y. Supp. 67, decided herewith.

It follows that the sixth finding of fact, contained in the decision, in so far as it finds that the E. J. Winslow Company owned the trade-name, or trade-mark, "Hydrolithic," should be reversed, and the forty-fifth finding, contained in the decision, and the third finding of fact, made at plaintiff's request, relating to defendant's counterclaim, should be reversed in toto, and the judgment dismissing the counterclaim should be modified, by granting judgment, with costs, in favor of the defendant on its counterclaim, to the extent of enjoining the plaintiff from in any manner using said trade-name or trade-mark and label, and from advertising, or otherwise holding itself out, as the successor in business to the said Winslow Company, and, as thus modified, affirmed, without costs of this appeal. All concur.